# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SHERRY GODSEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CV: 13-1930-IPJ |
| | ) | |
| CITY OF HUNTSVILLE, ALABAMA, | ) | |
| et al., | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Pending before the court are defendant City of Huntsville, Alabama's ("COH") motion for summary judgment (doc. 22), defendant Robert Burks' motion for summary judgment (doc. 23), the defendants' brief in support of motions for summary judgment (doc. 24) and evidentiary material (docs. 25-1 through 25-57), the plaintiff's response (doc. 30) and affidavit (doc. 30-1), the defendants' reply (doc. 31) and motion to strike the plaintiff's affidavit (doc. 32), and the plaintiff's response to the motion to strike (doc. 36). Plaintiff Sherry Godsey, an employee of COH since June 4, 2009, asserts several claims based on incidences of alleged sexual harassment by COH employee Burks, that took place from around July 2009 to June 2012 (doc. 1 pp. 3-6).[1] She asserts claims against COH for unlawful discrimination (Count One) and

---

[1] Godsey filed an employment discrimination charge with the Equal Employment Opportunity Commission on November 26, 2012 (doc. 1-1). The U.S. Department of Justice issued a Notice of Right to Sue Within 90 Days on July 23, 2013 (doc. 1-2). Godsey filed a

retaliation (Count Two) under Title VII of the Civil Rights Act of 1964, and negligent or wanton hiring, training, supervision, and retention (Count Seven).  *Id*. pp. 6-8, 10-12.  Against Burks she asserts claims for violation of 42 U.S.C. § 1983 (Count Three), assault and battery (Count Four), invasion of privacy (Count Five), and outrage (Count Six).  *Id*. pp. 8-11.

## STATEMENT OF THE FACTS[2]

### I.  COH's Chain-of-Command and Sexual Harassment Policies

During the relevant period, Godsey worked as a custodial janitor for the General Services Department of COH, which was headed by Jeff Easter (doc. 25-4 pp. 9-11).  Easter directly supervised several people, including Clifton McGinness.  *Id*. p. 10. McGinness supervised Amy Woodall, who was later replaced by Willie Lynch. *Id*. pp. 15-16.  Woodall, then Lynch, supervised Burks.  *Id*. p. 15.  In his position as a "custodial shift supervisor," Burks oversaw the cleaning and supplying of certain buildings and assigned daily cleaning tasks to those under his supervision.  *See id*. pp. 11-12; doc. 25-2 pp. 29-30, 40; doc. 25-3 p. 194; doc. 25-34 p. 10.  Depending on which buildings Godsey was assigned to clean, Burks or another person, including

---

complaint in this court on October 18, 2013 (doc. 1).  She also served COH with a notice of claim, pursuant to the requirements of Alabama law (doc. 1-3).

[2]  The statement of the facts is based on the evidence on record construed in the light most favorable to Godsey.  *See Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001).

Cassandra Ballard, supervised her work (doc. 25-4 pp. 11-12).  The General Services Department had a chain-of-command policy, which generally required employees to bring concerns, questions, or problems first to their direct supervisors.  *Id*. p. 16.

While Burks did not have authority to reassign workers to different buildings, he could make a recommendation to do so to his supervisor, who would sometimes take the recommendation (doc. 25-2 pp. 41-43).  Burks also had the authority to make an entry in a "conversation log" documenting any problem he had with his subordinates (doc. 25-4 p. 57).  When a conversation log was written, it was given to the next person up the chain of command and could work its way up to Easter.  *Id*. pp. 57-63.  In a log, Burks could ask his supervisor to take disciplinary action against a subordinate (doc. 25-2 p. 44).  Burks also could bring his concerns to his supervisor verbally, which could work its way up to Easter (doc. 25-4 pp. 58-59).  Easter had the ultimate authority to make disciplinary decisions, but he considered recommendations from supervisors in the chain below him.  *Id*. pp. 54-55.  When there was an issue with an employee's performance, he could issue a Notice of Departmental Hearing to address the issue.  *See id*. p. 53.

During the relevant time period and currently, when COH hires a new employee, a Human Resources employee goes over COH's sexual harassment policy with the employee, and the new employee signs a paper indicating that he or she was

briefed on the policy (doc. 25-5 pp. 36-37). Employees are advised that they do not have to stay within the chain-of-command policy of their department if they have a harassment complaint (doc. 25-3 pp. 38-39). Under the policy, an employee may take a complaint to their immediate supervisor or go directly to the Equal Employment Officer, Saundra Simmons, or the Director of Human Resources, Byron Thomas (doc. 25-36 p. 10; doc. 25-39 p. 13; doc. 25-3 pp. 12-13; doc. 25-5 p. 33). When an employee complains of harassment to a supervisor, the policy directs the supervisor to "immediately contact the Human Resources Director" (doc. 25-36 p. 10; doc. 25-39 p. 13).

The policy states that COH "does not tolerate harassment of employees and others based on, or related to, sex. . . . This policy applies to the actions of Department Heads, Division Managers, supervisors, [and] co-workers. . . . Department Heads, Division Managers, supervisors, and employees who violate this policy are subject to severe discipline, including termination of employment" (doc. 25-36 p. 9; doc. 25-39 p. 11). The policy also prevents retaliation on the basis of reported harassment and specifically defines the forms sexual harassment might take, including "unwelcome sexual advances, requests for sexual favors, or verbal or physical conduct of a sexual nature" (doc. 25-36 p. 9; doc. 25-39 pp. 11-12). It discusses that harassment occurs when submission to such conduct is made a condition of employment, a demand that

4

can be explicit or implied (doc. 25-36 p. 9; doc. 25-39 p. 12).  It states that "[n]o supervisor shall threaten or insinuate . . . that an employee's refusal to submit to sexual advances will adversely affect the employee's employment, evaluation, classification . . ., assigned duties, or any other condition of employment or career development" (doc. 25-36 p. 9; doc. 25-39 p. 12).

Upon Burks' and Godsey's employment with COH in June 2006 and June 2009, respectively, they received copies of the sexual harassment policy (doc. 25-1 pp. 37-39; doc. 25-33 p. 13; doc. 25-35 p. 23).  They also signed documents indicating that the harassment policy had been explained to them (doc. 25-1 pp. 40-41; doc. 25-33 p. 14; doc. 25-35 p. 24).  At the time of the alleged harassment, Godsey was aware of the sexual harassment policy and that she had an obligation to report sexual harassment as a COH employee (doc. 25-1 pp. 68, 135).

## II.  The Sexual Contact Between Burks and Godsey

On June 4, 2009, Godsey began cleaning buildings for COH (doc. 25-33 p. 12). She was assigned to clean certain buildings, some of which were assigned to Burks to oversee (*see* doc. 25-2 pp. 29-30).  A few weeks after she began work, she informed Burks that she had been unable to turn off the lights in the Aquatics Building after she had cleaned it (doc. 25-1 pp. 131-33).  They went to the building, which was closed to the public at the time, and when they arrived, Burks braced Godsey against a wall

and kissed her. *Id*. pp. 132-33, 138.  She did not tell him to stop, express that the kiss was unwelcome, or resist.  *Id*. p. 134.

The next incident took place in 2010 while Godsey cleaned the Scruggs Center, which was closed to the public at the time.  *Id*. pp. 137-38, 142.  Burks asked her to show him where she had cleaned the bathroom.  *Id*. p. 139.  When they entered the bathroom, he undid her belt, took her pants down, and kissed her.  *Id*. pp. 139-40.  The two had sex in the bathroom.  *Id*. p. 140.  She returned his kiss and did not tell him to stop or try to push him away.  *Id*. pp. 142-43.  He did not say anything to her during the incident and did not threaten her or her job.  *Id*. pp. 151, 219, 222.

Three weeks later in the bathroom of the Scruggs Center, which was closed to the public at the time, he again asked her to show him what she had cleaned.  *Id*. pp. 182-85.  When she told him that she did not want to go, he told her to "go back there." *Id*. p. 185.  He pulled her by her arm into the bathroom and took off her pants.  *Id*. pp. 185, 190.  She struggled to get away, but he put her arms around his neck and held her.  *Id*. p. 193.  When he kissed her, she did not kiss him back.  *Id*.  They had sex. *Id*. p. 192.  Because she was afraid someone would come in and catch them, she said, "we got to go," "we got to quit . . . get our clothes on," and "no, I don't want to do it." *Id*. pp. 186, 200-01.  After she said this, Burks stopped, pulled his clothes up, and left the bathroom.  *Id*. p. 201.  During this incident, he did not threaten her or her job.  *Id*.

6

pp. 219, 222.

The two had sexual contact a third time in the Scruggs Center after he told her to go into the bathroom to show him what she had cleaned. *Id*. p. 216. She told him she did not want to go into the bathroom, but went with him after he said loudly, "In there. In there." *Id*. pp. 216-17. He did not say anything else or threaten her or her job. *Id*. pp. 218-19, 221-22. While they were having sex, she told him to stop because she was afraid that someone would come into the bathroom. *Id*. p. 223. He said "okay," stopped, and left the bathroom. *Id*.

In early 2010, after the incidents at the Scruggs Center, he kissed her in the bathroom of another building that COH was contracted to clean. *Id*. pp. 168-70. She did not pull away, tell him "no," or indicate that the kiss was unwanted. *Id*. p. 170. She told him that they needed to get out of the building before they got caught by other people. *Id*. pp. 171-72.

Also after the incidents at the Scruggs Center, Godsey and Burks met twice at motel rooms. *Id*. p. 230. The first time, he asked her to get a room with him. *Id*. p. 244. She drove to the motel after her shift and met him prior to his shift beginning. *Id*. pp. 240-41. He went into the lobby to pay for the room while she stayed in her car. *Id*. p. 243. They entered the motel room and he took a shower while she watched television. *Id*. pp. 248-49. When he got out of the shower, he took her clothes off and

they had sex.  *Id*. p. 249.  She did not tell him that she did not want to do it or to stop.  *Id*. pp. 243-44, 250.  He did not threaten her physically before or during the first motel visit.  *Id*. p. 246.

On the second occasion, Godsey went to the motel alone and paid for the room in the afternoon.  *Id*. pp. 252-53.  She got off work at 12:00 a.m. the following day and waited at a McDonalds for Burks to get off work an hour later.  *Id*. pp. 234-35.  She then drove to the motel to meet him and they had sex.  *Id*. pp. 233, 257.  The only reservation she had about having sex with him on this occasion was that she did not want to spend money on the room.  *Id*. pp. 388-89.  Prior to going to one of the motels, he told her that if she did not meet him at the motel he would "write [her] up."  *Id*. p. 239.

The next incident occurred in the fall of 2010 in the upstairs women's bathroom of the Richard Showers Center, a building that was closed to the public at the time.  *Id*. pp. 145-49.  Burks removed Godsey's pants, kissed her, fondled her, and had sex with her.  *Id*. pp. 148-49.  She did not say "no," ask him to stop, or tell him that the contact was unwelcome.  *Id*. p. 150.  She returned his kisses.  *Id*.  Neither of them said anything during the encounter.  *Id*. pp. 150-51.

About a month later, after the Richard Showers Center had been closed to the public for the day, while showing Godsey what to clean, Burks took her to a closet

8

containing exercise mats. *Id*. pp. 269-70, 272.  He told her, "get in there," but did not threaten her. *Id*. pp. 272-73.  She said, "No.  I don't want to go in there." *Id*. p. 273. He again said, "Get in there." *Id*.  They had sex in the closet. *Id*. p. 270.  While in the closet, she pushed him and said, "Stop.  We got to get out of here.  We've got to get out." *Id*. pp. 275-76.  He stopped and got up. *Id*. p. 276.  She did not tell him that she did not want to have sex with him. *Id*.[3]

The next sexual contact took place in the men's bathroom at the Natatorium in early 2011 while the building was closed to the public. *Id*. pp. 154, 156, 161.  Burks told Godsey to show him where she had cleaned the bathroom, and she said that she did not want to show him. *Id*. p. 155.  He signaled for her to go into the bathroom and they both went in. *Id*.  After they entered the room, he undid her belt, put her arms around him, and kissed her. *Id*. p. 158.  She returned his kiss. *Id*. pp. 159-60.  He took her hands and made her do things she did not want to do and they had sex. *Id*. p. 158.  She pulled her hands away and told him to stop because she was afraid that someone would come in the door. *Id*. pp. 158-59.  He stopped. *Id*. p. 159.  She did not otherwise tell him to stop or indicate that the contact was unwanted. *Id*. p. 160. They had sex two other times at the Natatorium; however, the details of those encounters are not in the record. *See id*. pp. 286-87.  On one of these occasions, he

---

[3]  Apparently, there was another incident at the Richard Showers Center in the closet, the details of which are not in the record (*see* doc. 25-1 p. 269).

threatened to write her up if she did not go into the bathroom with him. *Id*. pp. 288-90.

The next incident took place in the men's bathroom at the Jaycee Center where Godsey was cleaning. *Id*. pp. 300-02. Burks went into the bathroom and called for her to come in. *Id*. p. 302. She said, "What?" *Id*. p. 303. He grabbed her, took her pants off, and would not let her leave the bathroom. He did not threaten her or say anything other than, "get in here." She told him that she did not want to have sex and he did it anyway. *Id*.

On a later date at the Jaycee Center, while she was cleaning for another company, Unique Cleaning, he went into one of the bathrooms and said, "In here. In here." *Id*. pp. 309-10, 314. She went in and he undid her belt and they had sex. *Id*. pp. 314-15. He did not threaten her. *Id*. p. 315. She told him that they were going to get caught by the Unique Cleaning people. *Id*. pp. 316-17. He was afraid of getting caught, so he hurried up, put his clothes on, and left. *Id*. p. 317. He told her not to tell the Unique Cleaning people about the incident. *Id*. She did not report the incident to her supervisor at Unique Cleaning. *Id*. pp. 310-11.

The next sexual contact occurred at the Westside Gym where she was cleaning. *Id*. pp. 317-18. She told him that she did not want to have sex with him. *Id*. p. 323. He said that if she did not go into the women's shower room with him and have sex,

he would "turn them people loose" on her, meaning he would open the doors to the building to allow people in who ordinarily sat in the parking lot of nearby apartments. *Id*. pp. 321-23.  They had sex in the shower room.  *Id*.

Approximately three months later in early 2012, he asked her to clean the Lakewood Center.  *Id*. pp. 342-45.  She did not want to clean the building.  *Id*. p. 345. She drove to the building, however, and after showing her what to clean, Burks locked her in the building.  *Id*. pp. 345-46.  He left in a van.  *Id*. p. 346.  Shortly after she finished cleaning, he returned and asked to see what she had cleaned.  *Id*. pp. 347, 350.  They went into a shower room, where he removed her pants.  *Id*. pp. 351-52. When she said she did not want to have sex, he told her to be quiet, but did not threaten her.  *Id*. pp. 355, 358.  They had sex.  *Id*. p. 351.  During sex, she told him that they should stop.  *Id*. pp. 354-55.

The next incident took place when Burks asked Godsey to go to the Max Luther Gym to clean.  *Id*. pp. 57, 359-60.  When she said she did not want to go, he said he would write her up.  *Id*. pp. 57, 360-61.  When she arrived at the gym, he was there with another woman who was cleaning.  *Id*. p. 361.  He told Godsey what to clean. *Id*. p. 372.  After she finished and showed him what she had done, he used his cell phone to call the other woman and asked her to come back and have a threesome with them.  *Id*. pp. 372-73.  The woman declined and left the building.  *Id*. p. 373.  Then,

Godsey followed Burks to a supply room where he took off her pants and they had sex.  *Id*. p. 381.  He did not threaten her.  *Id*. p. 382.  She told him that they should stop because someone was going to catch them.  *Id*. p. 386.  He said it would not take long, so they did not need to stop.  *Id*.

The next sexual contact occurred in 2012 in the women's bathroom of the Fleet Building where Godsey was cleaning.  *Id*. pp. 389, 393.[4]  On one of the occasions, Burks asked her to perform oral sex.  *Id*. pp. 453-54.  When she said she did not want to, he told her to do it anyway and that he would perform oral sex on her.  *Id*. p. 455. He did not threaten her.  *Id*. p. 454.  When he performed oral sex on her, she told him to stop because her back was hurting.  *Id*. pp. 456-57.  He stopped and they got up, dressed, and left.  *Id*. p. 457.

The final incident took place at the Fleet Building.  *Id*. p. 399.  Three to four weeks prior, Godsey had reported to Lynch that she needed supplies to clean with because Burks had not provided her with supplies.  *Id*. pp. 399, 405, 411.  Burks showed up that day at the building very angry, pointed his finger in her face, and said "one more time."  *Id*. p. 405.  He threw his radio on the floor.  *Id*. p. 406.  She was frightened and told him she would call the police unless he left the building.  *Id*.  He picked up his radio and left.  *Id*. p. 410.

---

[4]  Godsey testified that three or four incidents occurred in the Fleet Building (doc. 25-1 p. 390).  However, she described two and could not remember any others.  *Id*. pp. 457-58.

Three or four weeks later, Burks came back to the Fleet Building to deliver supplies to Godsey. *Id*. pp. 411-12.  He said, "in there," indicating the bathroom. *Id*. pp. 412-13.  He wanted her to show him what she had cleaned. *Id*. p. 419.  She said she did not want to go into the bathroom, but did not say that she did not want to have sex. *Id*. p. 425.  When they went into the bathroom, he kissed her and put her hands around his neck. *Id*. p. 419.  He undid her belt and took his pants down, and they began having sex. *Id*. p. 420.  He stopped and said, "hang on for just a minute," he had to get something.  She began putting her clothes on and he said, "No.  Leave your clothes off.  I'll be right back. . . . Stay in there."  She said, "All right." *Id*.

A few minutes later he came back, told her to bend over, and placed the handle of a plunger in her vagina. *Id*. pp. 420-21.  She felt behind her and asked, "What have you got?" *Id*. p. 421.  When he told her, she said, "Get it out." *Id*. pp. 418, 421.  He removed the plunger and took it back where it came from. *Id*. p. 421.  She put her clothes on and left the bathroom. *Id*.  He did not try to stop her and did not threaten her during the incident. *Id*. pp. 423, 430.

## III.  2012 Notice of Departmental Hearing

On June 4 and 5, 2012, Burks wrote conversation logs on Godsey, stating that she had spoken to him using profane language and, after he attempted to discuss issues with her clocking in and out at lunch, had threatened to "go over [his] head" and

13

report that he had tried to engage her in a threesome (doc. 25-2 pp. 45-47; doc. 25-24 pp. 522-24). McGinness, with Easter's approval, issued a Departmental Hearing Notice to Godsey, indicating that a hearing would be held on July 2, 2012, to address five potential violations of COH personnel policies and procedures (doc. 25-4 pp. 64-65; doc. 25-33 pp. 17-18). The hearing was to address allegations that she had treated employees of another cleaning contractor inappropriately and unprofessionally, and that on June 5, 2012, she had communicated with Burks in an undesirable and inappropriate manner (doc. 25-33 p. 17). It had also been reported that she was not clocking in and out correctly and that she had been resistive and insubordinate with her supervisors on a number of occasions. *Id*. p. 18.

In June of 2012, Burks took a letter to Godsey notifying her of the departmental hearing (doc. 25-2 p. 69). She refused to take the letter. *Id*. p. 70. Lynch explained to Godsey what the letter said, and she refused to go to the hearing (doc. 25-1 pp. 49-51). The hearing never took place (doc. 25-4 p. 64).

## IV. Godsey's Reports of Sexual Harassment

In 2010 or 2011, Godsey allerted her immediate supervisor, Ballard, and Ballard's supervisor, Woodall, that a week or two before, a man named Otis, who worked for A-1 Cleaning, had sexually harassed her at the Richard Showers Center (doc. 25-1 pp. 26, 28, 31-34). She reported Otis because he had notified her

supervisor that she was bothering him at work. *Id*. pp. 31-32.  She did not report the sexual contact with Burks at that time. *Id*. pp. 211-12.  While she had an opportunity to report Burks' harassment to Woodall or Ballard under her understanding of the chain-of-command policy, she did not think that they would believe her. *Id*. pp. 214, 296-97.  Woodall contacted A-1 Cleaning about the allegations against Otis and told them that he was no longer to be assigned to COH buildings (doc. 25-3 p. 230).

From 2009 to July 2, 2012, Godsey never reported to anyone at COH that she was being sexually harassed by Burks (doc. 25-1 p. 69).  She failed to report before then because she was afraid that she would lose her job. *Id*.  Despite having received COH's sexual harassment policy that said she did not have to report sexual harassment directly to her supervisor, Burks led her to believe that she had to report everything to him and could not go above his head. *Id*. pp. 206-07.  She knew that he did not have authority to fire her, but believed that he could tell someone to fire her and they would probably do it (doc. 25-1 pp. 76-77).

She finally reported on July 2, 2012, because she no longer cared about losing her job and she had recently told her husband about her sexual contact with Burks, and he told her how to report it. *Id*. pp. 69-70.  That day, which was at least three weeks after the final incident, she turned in her uniform to McGinness and told him that she was resigning. *Id*. pp. 304-05, 400.  She resigned because she was upset that her

15

supervisors did not bring her supplies and wrote people up, and that she was the last to know things going on with the job.  *Id*. pp. 470-71.  She did not tell McGinness about her sexual contact with Burks.  *Id*. p. 306.

Later that day, she went to the Human Resources Department and spoke with Equal Opportunity Officer Simmons.  *Id*. pp. 339-40; doc. 25-3 p. 89.  Simmons met with her for two to three hours, and Godsey filed a sexual harassment complaint against Burks (doc. 25-3 pp. 89-90; doc. 25-10 p. 3).  That day, after speaking with Godsey, Simmons met with Director of General Services Easter, Director of Human Resources Thomas, and a person from the COH Legal Department to discuss how to proceed (doc. 25-3 p. 204).  They decided that the Human Resources Department would not  process Godsey's resignation, and Simmons called Godsey and asked her if she wanted to come back to work.  *Id*. p. 205.  Godsey returned to work that afternoon.  *Id*.  When Burks came to work that day, Lynch, McGinness, and Easter met with him, placed him on administrative leave, and took his keys to the buildings. *Id*. pp. 204-05; doc. 25-2 pp. 75-76.

Simmons then conducted an extensive investigation into the allegations (*see* docs. 25-11 through 25-30).  Based on the information gathered, she made a number of findings (doc. 25-3 p. 213).  She first discussed her findings with Godsey, then Burks, then she sent them to Easter.  *Id*. pp. 213-14.  She found that Godsey was

generally credible regarding the sexual contact that she reported took place, and determined that the conduct was grossly inappropriate, demeaning, and, in the instance of the plunger, potentially physically harmful. *Id*. p. 223; doc. 25-11 p. 8.

Simmons could not determine whether the sexual contact was consensual based on three areas of Godsey's allegations that she found were "questionable" (doc. 25-3 p. 224). First, Simmons found it concerning that twice Godsey had met Burks at a motel and, on one occasion, had waited at McDonalds for him to get off work. *Id*. Second, Godsey gave him a ride home after the sexual contact had begun and reported having no problem doing it. *Id*.; *see* doc. 25-1 pp. 495-98. Third, Simmons was concerned with the fact that Godsey filed the complaint shortly after being served with a Notice of Departmental Hearing that was to take place on the day she filed the complaint (doc. 25-3 pp. 224-25). Simmons noted that Godsey had acted similarly when reporting Otis, where she reported harassment only after Otis complained to her supervisor about her. *Id*. p. 225. Simmons found that Godsey engaged in a pattern of reporting conduct as inappropriate after she thought that the alleged perpetrator had made a complaint against her. *Id*. However, Simmons concluded that there was no reason to believe that Godsey had consented to Burks' use of a plunger. *Id*. p. 255.

Simmons recommended to Easter that Burks be removed from supervising Godsey permanently and that steps be taken to minimize their contact (doc. 25-11 p.

2). When Easter received Simmons' findings, he decided to take Burks off of administrative leave and to separate Godsey and Burks so that they would not interact during work (doc. 25-4 pp. 72-73).  Burks returned to work on October 1, 2012, and was no longer Godsey's supervisor.  *Id*. p. 73; doc. 25-2 pp. 76, 78-79.  Easter told him not to contact Godsey (doc. 25-2 p. 78).  Godsey reported to Lynch or another individual if Lynch was not available (doc. 25-4 p. 73).  Burks and Godsey received sexual harassment training in October 2012, after the investigation, but had no training prior to that (doc. 25-3 pp. 24, 30, 215).  Since July 2, 2012, Burks has not spoken to Godsey (doc. 25-1 pp. 452-53; doc. 25-2 p. 76).

## V.  Godsey's Hours Temporarily Reduced

Godsey has always worked for COH on a part-time basis (doc. 25-1 pp. 97-98). When she began, she worked 25 hours per week.  *Id*.  In the fall of 2012, renovations began on one of the buildings she was assigned to clean, which would have potentially reduced her hours to 20 per week  (doc. 25-4 pp. 74-76; *see* doc. 25-55 p. 3).  She was offered a chance to work 24 hours per week by working on the weekends and she took the offer (doc. 25-4 p. 76; *see* doc. 25-55 p. 3).  She is still employed with COH and is now working 25 hours per week (doc. 25-1 p. 99; doc. 25-3 p. 83; doc. 25-55 p. 6). Her pay rate has never decreased, but has actually increased (doc. 25-1 pp. 482-83).

## VI.  The Effects of the Harassment

As a result of the alleged harassment, in 2011, Godsey began having less sex with her husband, as she lost her desire to do so.  *Id*. pp. 498-99, 501-02.  From 2009 until the present, she has been unable to sleep as well as she once could, a problem which  progressively has worsened over the years.  *Id*. pp. 502-03.  Her lack of sleep has "a little bit to do" with the harassment, but it is not because she is "worried" about the lawsuit.  *Id*. pp. 503-04; doc. 30-1 p. 2.

## STANDARD OF REVIEW

An order of summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001).  The evidence and, to the extent supportable by the record, all reasonable inferences taken from it are viewed in the light most favorable to the nonmovant.  *Id*.

## DISCUSSION

### I.  Sexual Harassment/Discrimination Claim

Title VII prohibits employers from discriminating against any individual with respect to her compensation, terms, conditions, or privileges of employment on the basis of such individual's sex.  42 U.S.C. § 2000e-2(a)(1).  To establish a Title VII claim based on sexual harassment, a plaintiff must prove "(1) that she belongs to a

protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists." *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006). Claims by a plaintiff seeking to hold an employer liable for the actions of a supervisor can be separated into two groups: (1) those in which the harassment results in a "tangible employment action"; and (2) those in which the harassment does not result in a tangible employment action, but constructively alters the employee's working conditions. *Frederick*, 246 F.3d at 1311.

The parties here do not contest that Godsey belongs to a protected group or that the alleged harassment was based on her sex. COH asserts, *inter alia*, that there is no legal basis for which to hold it liable for Burks' actions because he is not a "supervisor" for the purposes of Title VII and Godsey cannot show that COH was negligent in controlling working conditions (doc. 24 pp. 18-20). COH further asserts that even if Burks was Godsey's supervisor, it cannot be held liable because: (1) no tangible employment action was taken against Godsey (*id*. pp. 26-28); and (2) it exercised reasonable care to prevent and correct the behavior, and Godsey failed to take advantage of the preventive or corrective opportunities. *Id*. pp. 24-26.

20

The test for determining an employer's liability under Title VII depends on the status of the harasser as a supervisor or merely a co-worker. *Vance v. Ball State Univ.*, 133 S.Ct. 2434, 2439 (2013).  If the harasser is a co-worker of the victim, then the employer is liable only if it was negligent in controlling working conditions.  *Id*.  If the harasser is the victim's supervisor and a tangible employment action is taken, then the employer is strictly liable.  *Id*.  If no tangible employment action is taken, the employer may assert an affirmative defense showing that (1) it exercised reasonable care to prevent and correct the harassment, and (2) the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities provided.  *Id*.

Because the court concludes that COH is entitled to an affirmative defense even if Burks was Godsey's supervisor, for the purposes of this opinion, the court assumes that Burks was her supervisor under Title VII.  First, Burks' alleged harassment did not result in a tangible employment action.  A tangible employment action is one involving "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id*. at 2442 (quotation and citation omitted). In most cases, it inflicts direct economic harm and can include a reduction in an employee's hours resulting in a reduction in her take-home pay. *Cotton*, 434 F.3d at 1231.  A causal connection must exist between the employment action and the

harassment.  *Id*.

Godsey asserts that because Burks was her supervisor, she received a tangible job benefit for succumbing to the harassment (doc. 30 p. 21).  Yet, there is no evidence that she was promoted, given desirable assignments, allowed to keep her job, or otherwise benefitted based on her compliance or non-compliance with Burks' sexual advances.  Further, her reliance on allegations that Burks withheld supplies from her after she protested to having sex with him is not "a decision causing a significant change in benefits."  *See Vance*, 133 S.Ct. at 2434.  Godsey also implies that Burks initiated a disciplinary hearing based on "vague and stale allegations of misconduct" (doc. 30 p. 21).  Yet, there is no evidence that the Notice of Departmental Hearing was caused by the harassment, and the hearing never took place (doc. 25-4 p. 64).  *See Cotton*, 434 F.3d at 1231.  While her working hours were reduced from 25 to 24 per week in October 2012, she does not assert and has not established a causal connection between the reduction and the alleged harassment (doc. 30 p. 21).  *See Cotton*, 434 F.3d at 1231.

Because the harassment did not cause a tangible employment action, COH may avoid liability by establishing that it exercised reasonable care to prevent and correct Burks' behavior, and that Godsey failed to take advantage of the preventive or corrective opportunities.  *See Vance*, 133 S.Ct. at 2439.  COH acted with reasonable

care to prevent and correct Burks' behavior. It had a sexual harassment policy, which defined and prohibited the precise conduct alleged here (doc. 25-36 p. 9; doc. 25-39 pp. 11-13). The policy was disseminated to COH employees upon their employment, including Godsey and Burks (doc. 25-5 pp. 36-37; doc. 25-33 pp. 13-14; doc. 25-35 pp. 23-24). Employees were informed that they did not have to stay within the chain of command to report harassment and could go to the Director of Human Resources or the Equal Employment Officer (doc. 25-36 p. 10; doc. 25-39 p. 13). At the time of the alleged harassment, Godsey knew that there was a sexual harassment policy and was aware that she had a responsibility to report any harassment (doc. 25-1 pp. 68, 135).

COH also acted with reasonable care to correct Burks' behavior after Godsey reported it. Immediately after she filed the sexual harassment complaint, Burks was placed on administrative leave and his keys to the buildings were taken from him (doc. 25-3 pp. 204-05; doc. 25-2 pp. 75-76). Simmons conducted an extensive investigation into the allegations (*see* docs. 25-11 through 25-30). When the investigation was complete, Simmons reported her findings and recommendations to Godsey, Burks, and Easter (doc. 25-3 p. 213). She could not determine whether the sexual contact was consensual and recommended that Burks permanently be removed from supervising Godsey and steps be taken to minimize their contact. *Id*. p. 224; doc.

23

25-11 p. 2.  When Burks returned to work on October 1, 2012, he was no longer Godsey's supervisor, and arrangements were made for Godsey to report directly to Lynch or another person if Lynch was not available (doc. 25-4 p. 73).  That month, Burks and Godsey received sexual harassment training (doc. 25-3 pp. 24, 30).  Since July 2, 2012, when Godsey filed the harassment complaint with Simmons, Burks has not harassed Godsey or spoken to her (doc. 25-1 pp. 452-53; doc. 25-2 p. 76).

Godsey failed to take advantage of the preventative opportunities made available to her by COH.  While she was aware of and received a copy of the sexual harassment policy and understood her obligation to report harassment, she failed to report for approximately three years (doc. 25-1 pp. 68-69, 135; doc. 25-33 pp. 13-14).  While she believed that she had to go through the chain of command to report harassment, the policy clearly stated that reports could be made to the Director of Human Resources or the Equal Employment Officer (doc. 25-1 pp. 206-07; doc. 25-36 p. 10; doc. 25-39 p. 13).  Even based on her understanding of the chain-of-command policy, she knew that she could report the alleged harassment to another supervisor and simply did not do so, even when she reported another incident of sexual harassment by a different man (doc. 25-1 pp. 211-12, 214, 296-97).

Therefore, even assuming that Burks was Godsey's supervisor under Title VII, COH cannot be held liable for the alleged sexual harassment.  No tangible

24

employment action was taken against Godsey, and COH has established that it exercised reasonable care to prevent and correct Burks' behavior and that Godsey failed to take advantage of the preventive or corrective opportunities. *See Vance*, 133 S.Ct. at 2439.   Accordingly, COH's motion for summary judgment is due to be GRANTED as to the sexual harassment/discrimination claim (Count One).

## II. Retaliation Claim

To establish a *prima facie* claim for retaliation under Title VII, Godsey must show that:  (1) she engaged in statutorily protected expression, (2) she suffered an adverse employment action, and (3) there was a causal relation between the two events. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  If she establishes a *prima facie* case, COH may articulate a legitimate, non-retaliatory reason for the challenged employment action.  *Id*.  If COH does so, Godsey must prove by a preponderance of the evidence that the reason is pretext for prohibited, retaliatory conduct.  *Id.*

COH argues, *inter alia*, that Godsey has not established a *prima facie* claim for retaliation because she did not suffer an adverse employment action (doc. 24 pp. 25-26).  To satisfy this element of her claim, Godsey "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or

supporting the charge of [harassment]." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  Godsey does not respond to COH's motion for summary judgment as to the retaliation claim and has therefore abandoned the claim (doc. 30 p. 22). *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599-600 (11th Cir. 1995) (declining to address arguments not fairly presented in the district court). Therefore, summary judgment is due to be GRANTED in favor of COH as to the retaliation claim (Count Two).

## III.  Negligent or Wanton Hiring, Training, Supervision, and Retention

COH first argues that Godsey is prohibited under Alabama law to sue the municipality for the wanton conduct of its employees and agents (doc. 24 p. 28). *See Hilliard v. City of Huntsville*, 585 So.2d 889, 892 (Ala. 1991) (holding that, pursuant to Ala. Code § 11-47-190,  a municipality may not be held liable for wantonness). Godsey, offering nothing in response to COH's argument, has abandoned this claim. *See Resolution Trust Corp.*, 43 F.3d at 599-600.  Therefore, COH's motion for summary judgment is due to be GRANTED as to Godsey's claims for wanton hiring, training, supervision, and retention (Count Seven).

Second, COH argues that Godsey's negligence claims are not cognizable under Alabama law and that, even if Godsey's claims are cognizable, she has not established that it was negligent (doc. 24 pp. 29-30).  While *Ex parte City of Montgomery*, 99

So.3d 282, 299 (Ala. 2012), suggests the existence of a cause of action for negligent hiring, training, supervision, and retention against a municipality under Alabama law, COH is nevertheless entitled to summary judgment on these claims. *See Howard v. City of Demopolis, Ala.*, 984 F.Supp.2d 1245, 1260 (S.D. Ala. 2013). To hold COH liable, Godsey must put forth affirmative proof that COH and the employee for whose actions she seeks to hold COH liable knew, or should have known through exercise of proper care, of Burks' alleged incompetence. *Id.* Because she offers no evidence or argument in response to COH's motion for summary judgment and has abandoned these claims, the motion is due to be GRANTED as to the negligent hiring, training, supervision, and retention claims (Count Seven) (doc. 30 p. 22). *See also Resolution Trust Corp.*, 43 F.3d at 599-600.

## IV.  Section 1983 Claim

Section 1983 provides that every person who, under color of state law, deprives any citizen of any rights, privileges, or immunities secured by the Constitution and laws of the United States shall be liable to the party injured. 42 U.S.C. § 1983; *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001). Burks asserts that Godsey cannot establish that he acted under color of state law (doc. 24 pp. 31-33). "A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state." *Griffin*, 261 F.3d at 1303. Thus, the court must

determine whether the defendant acted pursuant to power he possessed by state authority or as a private individual. *Id*. A defendant acts under color of state law when he abuses the position given to him by the State. *Id*.

Based on the totality of the circumstances and construing the evidence in a light most favorable to Godsey, a reasonable jury could conclude that the alleged harassment occurred while Burks was acting under color of state law. *See id*. at 1303, 1305. Many of the incidents took place in buildings that were closed to the public at the time, and Burks' access to the buildings and Godsey was by virtue of his employment with COH (*see* doc. 25-1 pp. 135, 141-42, 149, 161, 184, 272). On two occasions, he threatened to "write [Godsey] up" as her supervisor if she did not have sex with him. *Id*. pp. 239, 288-89. On another occasion, he threatened to open the doors to the building she was cleaning to people outside and "turn them people loose" on her if she did not have sex with him. *Id*. pp. 321-23. Further, he would get her to go into the rooms where the sexual contact took place by instructing her to show him what she had cleaned, which was part of his duties as a custodial shift supervisor for COH. *Id*. pp. 155, 185, 216, 425-26; doc. 25-3 p. 194.

Thus, there is a sufficient nexus between Burks' duties and obligations as a COH custodial shift supervisor and his abuse of authority as such in facilitating the alleged harassment to survive summary judgment on this claim. *See Griffin*, 261 F.3d

at 1305.  Burks' motion for summary judgment is due to be DENIED as to Godsey's

§ 1983 claim (Count Three).

## V.  Assault and Battery and Invasion of Privacy Claims

Assault is "an intentional, unlawful, offer to touch the person of another in a

rude or angry manner under such circumstances as to create in the mind of the party

alleging the assault a well-founded fear of an imminent battery, coupled with the

apparent present ability to effectuate the attempt, if not prevented." *O'Rear v. B.H.*,

69 So.3d 106, 117 (Ala. 2011) (quotation and citation omitted).  To support a claim

of battery, "a plaintiff must establish:  (1) that the defendant touched the plaintiff;

(2) that the defendant intended to touch the plaintiff; and (3) that the touching was

conducted in a harmful or offensive manner."  *Ex parte Atmore Cmty. Hosp.*, 719

So.2d 1190, 1193 (Ala. 1998).  To establish a claim of invasion of privacy based on

sexual harassment, "a plaintiff must show:  (1) that the matters intruded into are of a

private nature; and (2) that the intrusion would be so offensive or objectionable that

a reasonable person subjected to it would experience outrage, mental suffering, shame,

or humiliation."  *Id*.

Burks asserts the defense of consent to Godsey's assault and battery and

invasion of privacy claims (doc. 24 pp. 33-34).  During much of the sexual contact,

Godsey did not resist Burks' advances, tell him to stop, or express that the contact was

29

unwelcome (*see e.g.*, doc. 25-1 pp. 134, 142-43, 150).  However, on several occasions she told him that she did not want to go with him into rooms where sexual contact had already taken place, and upon directing her to go in with him, he engaged her in sex. *Id*. pp. 155, 185, 216, 273, 425.  On one of these occasions, he grabbed her by the arm and pulled her into the bathroom.  *Id*. p. 190.  On three occasions, she told him that she did not want to engage in sexual contact with him before it occurred.  *Id*. pp. 303, 355, 455.  On two occasions, he threatened to "write [her] up" if she did not have sex with him.  *Id*. pp. 239, 288-89.  On another occasion, he threatened to "turn them people loose" on her if she did not have sex with him.  *Id*. pp. 321-23.  Finally, based on her investigation, Simmons concluded that there was no reason to believe that Godsey consented to Burks' use of a plunger (doc. 25-3 p. 255).

Thus, there remains a genuine issue of material fact as to whether Godsey consented to the sexual contact with Burks.  Thus, Burks' motion for summary judgment is due to be DENIED as to the assault and battery (Count Four) and invasion of privacy claims (Count Five).

## VI.  Outrage Claim

To establish a *prima facie* case of outrage, Godsey must show that Burks' conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected

to endure it." *O'Rear*, 69 So.3d at 118 (quotation and citation omitted).  Burks contends that Godsey did not suffer severe emotional distress and that his conduct was not extreme and outrageous (doc. 24 pp. 34-35).   Proof of egregious sexual harassment, such as has been presented in this case, constitutes extreme and outrageous conduct. *See O'Rear*, 69 So.3d at 118.  Godsey's testimony regarding the repeated sexual contact, particularly that involving use of a toilet plunger, is sufficient to create a jury question as to whether Burks' conduct was extreme and outrageous.

In regard to the distress suffered by Godsey as a result of Burks' actions, there is evidence that she is less sexually attracted to her husband and that she does not sleep as well as she once did (doc. 25-1 pp. 500-04).  The later is only caused in part by Burks' actions. *Id*. p. 503.  This is not such severe emotional distress that no reasonable person could be expected to endure it. *See O'Rear*, 69 So.3d at 118.  As Godsey cannot establish an essential element to support a claim for outrage (Count Six), Burks' motion for summary judgment is due to be GRANTED as to this claim.

## VII.  Motion to Strike

The motion to strike (doc. 32) is due to be DENIED, as Godsey's affidavit (doc. 30-1) purports to be based on her personal knowledge and does not contain hearsay. *See* Fed.R.Evid. 801(d)(2)(D).

**CONCLUSION**

Therefore, the court shall by separate order enter these findings and conclusions:

(1)     Defendant COH's motion for summary judgment is due to be **GRANTED**, and all claims (Counts One, Two, and Seven) against COH are **DISMISSED WITH PREJUDICE**;

(2)     Defendant Burks' motion for summary judgment is due to be **GRANTED, IN PART**, as to Godsey's claim for outrage, and the outrage claim (Count Six) is **DISMISSED WITH PREJUDICE**;

(3)     Defendant Burks' motion for summary judgment is due to be **DENIED, IN PART**, as to Godsey's § 1983 (Count Three), assault and battery (Count Four), and invasion of privacy claims (Count Five), which **SHALL PROCEED** against Burks.

(4)     The defendants' motion to strike Godsey's affidavit is due to be **DENIED**.

**DONE** and **ORDERED** this the 25th day of November, 2014.

INGE PRYTZ JOHNSON
SENIOR U.S. DISTRICT JUDGE